777 So.2d 342 (2000)
STATE of Florida, Appellant, Cross-Appellee,
v.
Dieter RIECHMANN, Appellee, Cross-Appellant.
Dieter Riechmann, Petitioner,
v.
STATE of Florida, Respondent.
Nos. SC89564, SC93236.
Supreme Court of Florida.
February 24, 2000.
Rehearing Denied January 31, 2001.
*347 Robert A. Butterworth, Attorney General, and Sandra S. Jaggard and Randall Sutton, Assistant Attorneys General, Miami, Florida, for Appellant, Cross-Appellee/Respondent.
Terri L. Backhus of Backhus & Izakowitz, Tampa, Florida, for Appellee, Cross-Appellant/Petitioner.
PER CURIAM.
The State appeals the trial court's order vacating Dieter Riechmann's death sentence and granting a new sentencing proceeding pursuant to Riechmann's Florida Rule of Criminal Procedure 3.850 motion. Riechmann cross-appeals the denial of his remaining claims and also petitions this Court for a writ of habeas corpus. We have jurisdiction. See art. V, § 3(b)(1), (9), Fla. Const. For the following reasons, we affirm the trial court's order in its entirety.

PROCEEDINGS TO DATE
The facts in this case are set forth in Riechmann v. State, 581 So.2d 133 (Fla. 1991). Briefly stated, the evidence established that Riechmann and Kersten Kischnick, "life companions," came to Miami, Florida from Germany in early October 1987, and Kischnick was shot to death as she sat in the passenger seat of an automobile driven by Riechmann. Riechmann was charged with her murder. At trial, the State's theory was that Kischnick was a prostitute who worked for Riechmann, and when she no longer wanted to work as a prostitute, Riechmann killed her in order to recover insurance proceeds.
Riechmann maintained that they were riding around videotaping some of Miami's sights when they got lost and asked for directions. He contended that the stranger whom they asked fired the shot that killed Kischnick. Riechmann sped away looking for help, driving several miles before he found a police officer.
At trial, an expert for the State testified that numerous particles usually found in gunpowder residue were discovered on Riechmann's hand and, accordingly, there was a reasonable scientific probability that Riechmann had fired a gun. In Riechmann's hotel room, the police found three handguns and several rounds of ammunition, and an expert firearms examiner testified that the bullets were the same type as used to kill Kischnick. The examiner testified that the bullet that killed Kischnick could have been fired from any of the three makes of guns found in Riechmann's room. A serologist testified that the high-velocity blood spatter found on the driver's seat could not have gotten there if the driver's seat was occupied in a normal driving position when the shot was fired from outside the passenger-side window. Riechmann was convicted of first-degree murder.
At the penalty phase, Riechmann's attorney presented no mitigating evidence. Subsequently, the jury recommended the death penalty by a vote of nine to three. The trial judge followed the jury's recommendation and sentenced Riechmann to death, finding two aggravating factors.[1] On appeal, this Court affirmed Riechmann's conviction and sentence,[2] and the U.S. Supreme Court denied Riechmann's petition for writ of certiorari.[3]
On September 30, 1994, Riechmann filed his initial 3.850 motion.[4] On May 13-17, *348 June 11, and July 17-19, 1996, the court conducted an evidentiary hearing on all of the fourteen claims except claim twelve.[5] Subsequently, the trial judge vacated Riechmann's sentence and ordered a new sentencing proceeding, concluding that Riechmann had received ineffective assistance of counsel at the penalty phase and that the sentencing order had been improperly written by the prosecutor instead of the judge. The judge denied the remainder of Riechmann's claims.

APPEAL
In these proceedings, the State appeals the trial court's order, while Riechmann challenges the denial of his other claims[6] as well as seeks habeas corpus, alleging primarily ineffective assistance of appellate counsel.[7]

I. RULE 3.850 MOTION[8]

A. State's Appeal

INEFFECTIVE ASSISTANCE AT PENALTY PHASE
In his 3.850 motion, Riechmann alleged that defense counsel was ineffective at the penalty phase of the trial in failing to investigate or present any evidence of mitigation. At the penalty phase of the trial, defense counsel presented no evidence to counter the State's claims of aggravation or in support of mitigation. Thereafter, in argument, defense counsel reviewed the guilt-phase evidence with the jury, argued to the jury that Riechmann was an intelligent person with many decent qualities, and emphasized the testimony of Dina Moeller, a witness who had told the police that Riechmann loved Kischnick. He also discussed several aspects of the death penalty with the jury and told the jury how Riechmann had once saved Kischnick's life by telling her not to sit in the bathtub with the blower nearby.
At the evidentiary hearing, however, Riechmann presented seven witnesses[9] who testified in detail about the positive personal qualities Riechmann showed during the extensive period that they knew him. They also established that he had a long-lasting "loving relationship" with Kischnick. They testified that they were available, willing and would have testified at Riechmann's trial if they had been contacted and requested to do so. The court also accepted affidavits of other witnesses *349 who were unable to testify, including Riechmann's mother and brother, in praise of the earlier portions of his life. In addition, Riechmann presented Steven Potolsky,[10] an attorney specializing in criminal law, as an expert witness. Potolsky testified that based on his review of the trial record, counsel's performance fell "well below effective representation." Moreover, he testified that he would not refer to the penalty portion of the trial as a penalty phase proceeding because no evidence was presented. Finally, defense counsel testified that he was unable to provide an explanation as to why he did not contact any of the witnesses contained in a handwritten list prepared by Riechmann entitled "Please Take in Germany Deposition."
Based primarily on the evidence discussed above, the evidentiary hearing court made the following findings:
The Court concludes that trial counsel's performance at sentencing was deficient. First, trial counsel failed to renew or pursue his motion to obtain the German and Swiss statements which would have provided him with mitigating evidence to present to the jury. To not do so vigorously when he lacked any mitigating evidence of his own was unreasonable and below community standards, especially where his closing argument contained little, if anything, of a mitigating nature.
Second, trial counsel's sentencing investigation was patently inadequate. At the post conviction hearing, he offered no reasonable explanation as to why he did not independently act in the best interest of his client to search for potential mitigating evidence. He spoke to no witnesses in Germany, and only spoke to members of the Defendant's family about efforts to raise funds, but not "much about the facts of the case." Regarding family members being helpful as witnesses, he stated, "I was able to determine that they weren't really available to me." He conceded he did not send an investigator to Germany, and clarified that he was not prohibited by the Defendant from conducting such an investigation. His file contained the Defendant's hand written list of persons in Germany for him to contact, but he did not recollect calling anyone on the list.
Consequently, trial counsel failed to unearth a large amount of mitigating evidence as to the Defendant's character, family history and relationship with the Victim, which could have been presented at sentencing. At the post conviction hearing, the Defendant presented the testimony of fifteen (15) individuals from Germany who were willing and able to testify at the Defendant's trial had they been contacted and asked to do so. The Court heard from landladies and neighbors Monika and Marlene Seeger, friends Martin and Ulrike Karpischek and Wolfgang Walitzky, and former relationship partners Doris Dessauer and Doris Rindelaub. All traveled from Germany at their own expense to speak for the Defendant. The Court also received written statements from many other individuals who would have made every effort to attend the trial, but who were unable to attend the post conviction hearing: friend and associate Otmar Fritz, friends Angelika Fritz, Sabine Plott, and Thomas Woehe; neighbor Modersohn; the Defendant's mother, Martha, and brother, Hans-Henning, and trial witness Ernst Steffen.
The Court concludes that the Defendant was prejudiced by his counsel's failure to present available mitigation as to his positive character traits, personal history and family background.... With such evidence presented, there is reasonable probability the outcome of *350 the case would have been different, as against a jury, who without any mitigating evidence, was already ambivalent about their recommendation.
Order on Motion to Vacate Judgment of Conviction and Sentence (hereinafter cited as Order) at 53-55 (citations omitted).
In order to prove an ineffective assistance of counsel claim, a defendant must establish two elements:
First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.
Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); see also Rutherford v. State, 727 So.2d 216 (Fla.1998); Rose v. State, 675 So.2d 567 (Fla.1996). In Maxwell v. Wainwright, 490 So.2d 927 (Fla.1986), this Court further explained the application of the Strickland standard:
A claim of ineffective assistance of counsel, to be considered meritorious, must include two general components. First, the claimant must identify particular acts or omissions of the lawyer that are shown to be outside the broad range of reasonably competent performance under prevailing professional standards. Second, the clear, substantial deficiency shown must further be demonstrated to have so affected the fairness and reliability of the proceeding that confidence in the outcome is undermined.
Id. at 932 (citing Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and Downs v. State, 453 So.2d 1102 (Fla.1984)). Ineffective assistance of counsel claims present a mixed question of law and fact subject to plenary review based on the Strickland test. See Rose v. State, 675 So.2d 567, 571 (Fla. 1996). This requires an independent review of the trial court's legal conclusions, while giving deference to the trial court's factual findings.
As stated above, the record and evidence presented at the evidentiary hearing clearly support the trial court's factual findings that defense counsel's conduct was deficient. The trial court's obvious concern was that counsel conducted no investigation and presented no evidence of mitigation. In this vein, we have recognized that an attorney has a strict duty to conduct a reasonable investigation of a defendant's background for possible mitigating evidence. See Rose, 675 So.2d at 571 (citing Porter v. Singletary, 14 F.3d 554, 557 (11th Cir.1994)). The failure to investigate and present available mitigating evidence is of critical concern along with the reasons for not doing so. See Rose, 675 So.2d at 571.
Although there was some evidence suggesting that Riechmann did not want defense counsel to go to Germany, defense counsel conceded that Riechmann did not instruct him or preclude him from investigating further or presenting mitigating evidence. Moreover, defense counsel was unable to provide any explanation as to why he did not conduct an investigation or contact witnesses available to him.
Thus, it is apparent that the trial court's factual findings are supported by competent and substantial evidence and its legal conclusions are supported by our prior opinions in Mitchell v. State, 595 So.2d 938, 941 (Fla.1992) (holding that penalty phase representation was ineffective where defense counsel presented no evidence of mitigation but where evidence was presented at the evidentiary hearing that could have supported statutory and nonstatutory evidence); Bassett v. State, 541 So.2d 596, 597 (Fla.1989) (holding that defense counsel's failure to discover material nonstatutory evidence of mitigation consisting of defendant's domination *351 by other individuals and the difference in age between him and his codefendant raised a reasonable probability that the jury's recommendation would have been different); and Stevens v. State, 552 So.2d 1082, 1087 (Fla.1989) (holding that defense counsel's failure to investigate defendant's background, failure to present mitigating evidence during the penalty phase, and failure to argue on defendant's behalf rendered defense counsel's conduct at the penalty phase ineffective). It seems apparent that there would be few cases, if any, where defense counsel would be justified in failing to investigate and present a case for the defendant in the penalty phase of a capital case.

EX PARTE COMMUNICATION AND IMPROPER DRAFTING OF ORDER
The trial court also concluded that Riechmann was denied an independent weighing of aggravating and mitigating circumstances because the trial judge, through an ex parte communication with the prosecutor, delegated the responsibility to the prosecutor to write the order sentencing Riechmann to death.
The postconviction testimony of the prosecutor established that he, and not the trial judge, prepared the draft order at the ex parte request of the trial judge following the conclusion of the penalty phase of the trial. Specifically, the prosecutor testified that he was asked by the trial judge to prepare the sentencing order as they crossed in the hall, and that he took no notes and had no recording device with him at the time. Moreover, he testified that he was responsible for providing the legal support for the order and that he drafted the aggravating factors and excluded any mitigating factors.
The postconviction trial court found that neither the ex parte communication nor the draft order was disclosed to defense counsel during any stage of the penalty phase.[11] Further, upon a review of the draft order and the subsequent final order, the evidentiary hearing judge concluded that they were virtually identical. In Patterson v. State, 513 So.2d 1257, 1261 (Fla. 1987), we specifically held that the trial judge improperly delegated to the state the responsibility of preparing the sentencing order because the judge did not independently determine the specific aggravating and mitigating circumstances that applied in the case before directing the preparation of the order. We further found that the trial judge's actions raised a serious question concerning the weighing process that must be conducted before imposing a death penalty. See id. at 1262.
Section 921.141, Florida Statutes (1985), required the trial judge to independently weigh the aggravating and mitigating circumstances to determine what penalty should be imposed upon the defendant.[12] This section also requires the trial judge to draft the order.
In this case, the judge's actions were further compounded by his ex parte communication with the prosecutor to prepare the order. Canon 3B(7) of the Code of Judicial Conduct provides that "[a] judge shall not initiate, permit, or consider ex parte communications, or consider other communications made to the judge outside the presence of the parties concerning a pending or impending proceeding." Based on this principle, this Court has repeatedly stated that there is nothing "more dangerous and destructive of the impartiality of the judiciary than a one-sided communication between a judge and a single litigant." Spencer v. State, 615 So.2d 688, 691 (Fla. 1993) (quoting Rose v. State, 601 So.2d 1181, 1183 (Fla.1992)).
*352 In Spencer, we reversed the defendant's conviction and remanded based on reversible error occurring in both the jury selection process and the sentencing portion of the penalty phase. Our decision was predicated in part on the trial judge's error of formulating his decision prior to giving the defendant an opportunity to be heard and in part on an improper ex parte communication.[13]
The State further alleges that under Card v. State, 652 So.2d 344 (Fla.1995), a new sentencing proceeding or hearing should not automatically be ordered solely because the prosecutor prepares the order for the judge (allegedly pursuant to an ex parte communication). In Card, the defendant made a similar claim to the one made by Riechmann. There, we remanded for an evidentiary hearing for the judge to determine whether the defendant was deprived of an independent weighing of aggravating and mitigating circumstances. See id. at 345. In so doing, we instructed the judge to consider the nature of the contact between the judge and the prosecutor, when the judge was given the order, and when he gave copies to the defendant. See id. at 346.
In the present case, the trial court's order reflects that the evidentiary hearing judge considered these factors in concluding that Riechmann was denied an independent weighing of the aggravating and mitigating circumstances. Specifically, the judge found: "Unlike the cases distinguished in Patterson, the record contains no oral findings independently made by the trial judge, which satisfies the weighing process required by Section 921.141(3), nor did defense counsel know that the State had prepared a sentencing order to which he failed to object." Order at 50. The record supports the trial judge's findings.
In this case, there is no evidence in the record that the trial judge specifically determined the aggravating or mitigating circumstances that applied or weighed the evidence before delegating the authority to write the order. In fact, at the evidentiary hearing, the prosecutor testified that the judge asked him to prepare the order, but that the judge did not give him any specifics as to what he had or had not found. The judge, on the other hand, testified that he could not remember what he told the prosecutor. Moreover, the trial transcript reflects that at the sentencing hearing, the trial judge merely read from the order and articulated no specific findings for this Court to review.
We therefore approve the evidentiary hearing judge's findings and conclusion, which he summarized as followed:
[W]hen the cumulative effect of the trial counsel's deficiency is viewed in conjunction with the improper actions of the trial judge and prosecutor during the penalty phase, the Court is compelled to find, under the circumstances of this case, that confidence in the outcome of the Defendant's penalty phase has been undermined, and that the Defendant has been denied a reliable penalty phase proceedings [sic].
Order at 55 (citation omitted). Although the people of Florida have approved of the death penalty for the worst of crimes, this punishment cannot be imposed in an arbitrary or capricious manner. In fact, as we have previously stated, the Legislature has gone to great lengths to adopt a procedure consisting of aggravation and mitigation, and which requires a careful balancing and weighing of these circumstances. See State v. Dixon, 283 So.2d 1, 7 (1973). We agree with the trial court that confidence in the outcome of the penalty phase was *353 substantially undermined by the performance of defense counsel and the conduct of the sentencing court.

B. Riechmann's Appeal
As previously mentioned, Riechmann raises eight issues in his cross appeal of the trial court's denial of his claims. We conclude that these claims are either procedurally barred or without substantial merit.[14] However, some merit further explanation.

*354 INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL
Riechmann's first claim of ineffective assistance of counsel challenges counsel's performance during the guilt phase of the trial and raises five subissues that merit discussion: (1) failure to challenge blood spatter evidence; (2) failure to use existing expertise to discredit the state's gunshot residue and ballistic evidence; (3) failure to investigate during the guilt phase; (4) error in calling Riechmann as a defense witness; and (5) failure to request appointment of second counsel. We address each in turn.

1. Blood Spatter Evidence
First, Riechmann argues that defense counsel was deficient for failing to call an expert witness to rebut the trial testimony of the State's crime lab serologist, David Rhodes, who testified at trial that high velocity blood spatter found on the driver side door inside the car in which Kischnick was shot could not have gotten there if the driver's seat was occupied in a normal driving position when the shot was fired from outside the car. Rhodes also testified that blood found on a blanket folded on the driver's seat was also consistent with high-velocity blood spatter and aspirated blood.
At the evidentiary hearing, Riechmann presented the testimony of Mr. Stuart James, who testified that the small specks of blood on the driver's side door could have gotten there a number of different ways, especially due to the amount of activity occurring in the car after the shooting. James challenged the reliability of the string test used by Rhodes to determine the origin of the blood on the door, asserting that there was no possible way that blood from a wound on the right side of the passenger's head could reach that portion of the door. Finally, he challenged the reliability of the finding that blood found on the blanket was from blood spatter, because blood spatter does not drip through anything and dries immediately. Therefore, James concluded that since there was blood on both sides of the blanket, it was precluded from being blood spatter. Riechmann also presented the testimony of attorney expert Potolsky, who testified that given the nature of the case, it would have been necessary to call an expert in the area of blood spatter interpretation.
To determine whether counsel was ineffective, a number of factors should be considered. First among these are the attorney's reasons for performing in an allegedly deficient manner, including consideration of the attorney's tactical decisions. See State v. Bolender, 503 So.2d 1247, 1250 (Fla.1987); Lightbourne v. State, 471 So.2d 27, 28 (Fla.1985). A second factor is whether cross-examination of the State's expert brings out the expert's weaknesses and whether those weaknesses are argued to the jury. Card v. Dugger, 911 F.2d 1494 (11th Cir.1990). See Rose v. State, 617 So.2d 291, 297 (Fla.1993); The final factor is whether a defendant can show that an expert was available at the time of trial to rebut the State's expert. See Elledge v. Dugger, 823 F.2d 1439, 1446 (11th Cir.1987).
The evidentiary hearing court's order provides:
On cross-examination, Mr. Rhodes admitted that he did not know how the blood got onto the driver's side door; that deflection was a possibility but not a probability; that he did not have any other explanation how blood got from the right side of the Victim's head to the left side of the car; that he did not know if blood was deposited in the car in one event; that it was possible that the acceleration of the car with the passenger window open and the wind blowing could account for blood splatter [sic] being *355 found on the left side of the car; that it was possible that the blood on the blanket resulted from aspirated blood from the Victim; that he did not know how the blood specks on the driver's door occurred in a line, and that he did not know if the blood on the blanket was human blood or animal blood.
Order at 16-17 (citations omitted). The evidentiary hearing court also found that in light of the time constraints immediately before trial, Riechmann had not met his burden of proving that James or another expert would have been available or prepared to testify at the time of trial. Order at 16.
The record supports the trial court's findings. In fact, the trial record reflects that Rhodes testified that he could not say conclusively that there was no one seated in the driver's seat when Kischnick was shot. Further, the weaknesses elicited from Rhodes on cross-examination were essentially the same weaknesses that James testified to at the evidentiary hearing. Therefore, the jury was aware of the points that James made. As to his availability at trial, James speculated that he presumed, depending on scheduling, that he or his associates would have come to court to testify.
As to the prejudice prong of the analysis, the court found that the jury's determination of guilt was supported by the circumstantial evidence admitted at trial and the jury's own evaluation of Riechmann's credibility following his testimony. This evidence included: the bullets recovered from Riechmann's motel room that matched the type used to kill Kischnick; Riechmann's possession of two of the only three types of weapons that could have been used to kill Kischnick, showing his preference for that type of weapon; expert testimony that particles found on Riechmann's hands established a reasonable probability that Riechmann fired the gun; insurance policies, reciprocal wills, and other evidence that established a motive; the considerable evidence offered by the State to impeach Riechmann on the stand; and testimony by a fellow inmate that Riechmann was pleased with the prospect of becoming rich from the proceeds of the insurance policies and the victim's will.
We find that the trial court's legal conclusions are supported by the case law. See Adams v. Dugger, 816 F.2d 1493 (11th Cir.1987) (holding that defense counsel was not ineffective for failing to obtain expert pathologist where defense counsel cross-examined State expert and argued weaknesses in testimony to jury in closing argument); Jones v. Smith, 772 F.2d 668, 674 (11th Cir.1985) (holding that defense counsel's failure to offer opinion of qualified expert as to the unreliability of eyewitness testimony did not constitute ineffective assistance of counsel where counsel pointed out the likelihood of mistaken identification during cross-examination); Rose v. State, 617 So.2d at 297 (holding that defense counsel was not ineffective for failing to obtain expert in eyewitness identification when, instead, he pointed out inconsistencies between the eyewitnesses' testimony as well as differences in the trial testimony of each witness and his or her earlier statements); Wilkins v. State, 685 So.2d 957, 958-59 (Fla. 4th DCA 1996).

2. Gunshot Residue and Ballistic Evidence
Riechmann alleges that defense counsel was ineffective in failing to use information contained in published journals to challenge the State's gunshot residue expert, Mr. Gopinath Rao. At trial, Mr. Rao testified to a reasonable degree of scientific probability that based on the gunshot residue on Riechmann's hands, Riechmann fired a gun at the time of the shooting. Defense counsel conducted a cross-examination wherein Rao admitted that the gunshot residue could have come from handling a gun or being near a gun, and that it did not necessarily mean that the person had fired a gun. Defense counsel also presented the testimony of Dr. Vincent P. Guinn, an expert, who testified that the particles found on Riechmann's *356 hands proved only that Riechmann was in the vicinity of a gun when it was fired, not that he had actually fired a gun. He also testified that Rao's conclusion had no scientific support.
At the evidentiary hearing, Riechmann presented the testimony of Mr. Raymond Cooper, an expert in firearms identification and gunshot residue analysis, who testified that several FBI publications support the view that gunshot residue can result simply from being in close proximity to a discharged weapon. The evidentiary hearing court concluded:
During his cross examination, Mr. Rao conceded that the presence of gunshot residue on a person's hands did not mean that person was the shooter. He further agreed that other possibilities could explain its presence, such as if a person's hands were in close proximity to a gun when it was fired, or if such person had previously handled a discharged weapon. Under such circumstances, any failure to use authoritative publications to obtain the same concessions was not deficient performance within the meaning of Strickland, since cross-examination at trial was already sufficient to show the weaknesses in the witnesses' testimony.
Order at 23-24 (citations omitted).
Counsel is not necessarily ineffective for failing to impeach a witness with a report, if cross-examination is used to bring out the weaknesses in the witness's testimony. See Card v. Dugger, 911 F.2d 1494, 1507 (11th Cir.1990). Moreover, failing to present cumulative impeachment evidence does not necessarily constitute ineffective assistance. See Valle v. State, 705 So.2d 1331, 1334-35 (Fla. 1997); Provenzano v. Dugger, 561 So.2d 541, 545-46 (Fla.1990).
Riechmann also asserts that counsel was ineffective for failing to rebut the State's ballistic expert at trial, Mr. Quirk, who testified that only three main weapons could have fired the bullet that killed Kischnick. At the evidentiary hearing, Quirk testified that the data he used to make this finding was limited to those guns that passed through the Metro-Dade Crime Lab, instead of the more inclusive FBI crime lab. At the hearing, Cooper testified that fourteen different types of guns could have been used to fire the bullet that killed Kischnick. However, neither Quirk nor Cooper was able to state whether the list that provided the fourteen different types of weapons was available at the time of Riechmann's trial. Moreover, in regard to prejudice, the court found that there was no reasonable probability that this new evidence would have affected the result of the proceeding. The evidence presented at trial also established that Kischnick had less gunshot residue than Riechmann, although she was closer to the shooter and Riechmann moved considerably more after the incident and had more opportunities for the gunshot residue to disappear. The evidence also established that forty bullets of the same type that killed Kischnick were found in a fifty-shell box in Riechmann's motel. We approve the trial court's factual findings and legal conclusions on this issue.

3. Failure to Investigate
As his third subissue, Riechmann complains of counsel's failure to conduct further investigation into certain aspects of his case.[15] The trial court found that for *357 all but one of these claims, Riechmann failed to demonstrate the requisite deficiency or prejudice. As for the claim concerning Riechmann's relationship with Kischnick, the court found a lack of prejudice because it concerned evidence which was already admitted at trial, only in a different manner than now asserted. For example, at trial, counsel secured testimony from a State's witness of Riechmann's love for Kischnick. The jury was also presented with a videotape of the couple the night of the murder that showed them involved in a loving relationship. Again, we find that the trial judge's factual findings are supported by competent and substantial evidence, and his legal conclusions are supported by our prior case law. Furthermore, counsel could not be held ineffective for failing to present witnesses from a list withheld from him. See Roberts v. State, 568 So.2d 1255, 1259 (Fla. 1990) ("Counsel cannot be considered deficient in performance for failing to present evidence which allegedly has been improperly withheld by the state.").[16] We conclude that Riechmann's remaining subclaims on the issue of counsel's failure to investigate also fail because counsel either had a tactical reason for each choice or the evidence allegedly not presented had already been presented to the jury, albeit in a different manner.
Riechmann claims that counsel should have called the waiter who attended the couple on the night of the murder and two newly found eyewitnesses who testified at the evidentiary hearing. However, the evidence shows that counsel attempted to locate the waiter but was unable to do so. In addition, this evidence would have been cumulative because the jury was shown a videotape of the couple on the night of the murder that reflected their festive mood and intoxicated state.
As to the two eyewitnesses, defense counsel testified that Riechmann was unable to tell them where the crime had occurred. In fact, the witnesses testified that the crime occurred just west of Biscayne Boulevard and 63rd Street, roughly 100 blocks away from where Riechmann had told counsel that he thought he had gotten lost. Moreover, one of the two eyewitnesses testified that he avoided the area for about a month after the crime, and the other witness testified that he did not wish to become involved in the investigation at the time of the crime. Therefore, Riechmann has failed to prove that these witnesses could have been located at the time of trial through the use of due diligence or investigation.
Riechmann also claims that defense counsel was deficient for failing to investigate evidence that would have discredited the State's jailhouse informant, Smykowski, who testified that Riechmann was elated at the prospect of becoming a millionaire from Kischnick's insurance policies. During trial, defense counsel received a letter from an inmate offering himself as a witness to testify as to Smykowski's lack of credibility and reputation of being a "snitch" around the jail. At the evidentiary hearing, defense counsel testified that he read the letter, but after conversing with Riechmann, he made the tactical decision not to call this witness or any other inmate to rebut Smykowski's testimony. His main reasons were that any inmate presented would be vehemently impeached concerning his prior criminal records, and Riechmann had represented to counsel that any conversation with Smykowski occurred in private and was not overheard by any inmates. Based on this testimony, the trial court found that counsel's decision was a reasonable one under the circumstances. The trial court's conclusion is supported by our prior decision in Rose v. State, 675 So.2d 567, 570 (Fla. 1996) (holding that counsel's decision not to call certain witnesses was a reasoned decision since it was apparent that the State could have successfully impeached them).
*358 Next, Riechmann alleges that counsel was ineffective for failing to introduce a secretly-recorded four hour tape of an interview with Detective Matthews of the Miami Beach Police Department, which Riechmann claims could have been used at trial to show the extent to which the police harassed him and to show Riechmann's sincerity after the crime. We agree with the trial court that counsel was not ineffective in this regard. In fact, at a suppression hearing before trial, counsel argued against the admissibility of this tape. Moreover, Riechmann has not established the requisite showing of prejudice because the evidence shows that a similar tape, recorded the day before, was introduced at trial and played to the jury. Through cross-examination, counsel also showed that Detective Matthews used a fictitious story in that tape to attempt to elicit a confession from Riechmann.
Riechmann also claims that counsel failed to explore and present to the jury cultural differences between Germany and the United States; specifically that prostitution is legal in Germany. This claim is also without merit. This evidence had already been presented to the jury through the testimony of Kischnick's working partner. Moreover, Riechmann has failed to show a reasonable probability of how this would have affected the outcome of the trial. Riechmann's final subclaim, that defense counsel was ineffective for failing to investigate the extent and seriousness of Kischnick's gynecological condition, is also without merit. At trial, the medical examiner testified that many sexually active and pregnant women suffer from this condition and that the condition can be treated successfully with medication; therefore, the jury was aware that she could have continued working as a prostitute.
The judge examined each claim individually and also considered each claim in light of the total evidence. See generally State v. Bucherie, 468 So.2d 229, 231 (Fla.1985); Downs v. State, 453 So.2d 1102, 1109 (Fla. 1984). The record supports the judge's factual findings and his conclusions of law are supported by our prior decisions. See, e.g., Torres-Arboleda v. Dugger, 636 So.2d 1321, 1324 ( Fla.1994); Jackson v. Dugger, 633 So.2d 1051, 1054 (Fla.1993).

4. Calling Riechmann as Defense Witness
Riechmann alleges that counsel erred in calling him as a witness at trial. At the hearing, counsel conceded that he did not initially plan on calling Riechmann. However, after hearing that a juror had informed a journalist that the jury was prepared to convict, he encouraged Riechmann to testify.[17] He felt that putting Riechmann on the stand was necessary if he hoped to prevail. Although he testified that Riechmann's testimony turned out to be an "unmitigated disaster," he did not expect it to be so when he made his decision to put him on the stand.
In determining deficiency, "[a] fair assessment ... requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689, 104 S.Ct. 2052; see also Cherry v. State, 659 So.2d 1069 (Fla.1995). In its order, the evidentiary hearing court determined that counsel was not ineffective in calling Riechmann as a witness because, based on the facts known to him at the time and his extensive experience in the field of capital cases, counsel made a reasonable tactical decision. This finding is supported by the evidence. Moreover, the trial court's legal conclusion is supported by our prior decisions. See, e.g., Koon v. Dugger, 619 So.2d 246, 249 (Fla. 1993) (holding that counsel's decision not to present a voluntary intoxication defense was a reasonable trial tactic predicated on counsel's experience, his assessment of the case, and defendant's expressed desires).

*359 5. Failing to Request Appointment of Second Counsel
Finally, Riechmann alleges that counsel provided ineffective assistance because his attorney did not request, and the trial judge did not appoint, two attorneys to represent him in the case. However, Riechmann has not specifically shown how counsel's solo representation affected his performance at trial; therefore, the trial court correctly found this claim to be without merit based on our decision in Armstrong v. State, 642 So.2d 730, 737 (Fla. 1994), wherein we held that a defendant is not denied effective assistance of counsel merely because he has only one attorney.

NEWLY DISCOVERED EVIDENCE
Riechmann alleges three categories of newly discovered evidence: (1) two newly discovered eyewitnesses to the murder (Early Stitt and Hilton Williams); (2) newly discovered evidence that the testimony of jailhouse informant Smykowski was knowingly false; and (3) newly discovered evidence of subsequent similar murders confirming Riechmann's accounts of the murder.[18]
This Court has held that defendants must satisfy two requirements in order to have a conviction set aside on the basis of newly discovered evidence:
First ... newly discovered ... evidence "must have been unknown by the trial court, by the party, or by counsel at the time of trial, and it must appear that defendant or his counsel could not have known [of it] by the use of due diligence."
Second, the newly discovered evidence must be of such nature that it would probably produce an acquittal on retrial....
In considering the second prong, the trial court should initially consider whether the evidence would have been admissible at trial or whether there would have been any evidentiary bars to its admissibility.... The trial court should further consider the materiality and relevance of the evidence and any inconsistencies in the newly discovered evidence.
Jones v. State, 709 So.2d 512, 521 (Fla. 1998) (quoting Torres-Arboleda v. Dugger, 636 So.2d at 1324-25) (alteration in original) (citations omitted).

1. Testimony of Two Newly Discovered Eyewitnesses
The first eyewitness presented by Riechmann, Early Stitt, testified at the evidentiary hearing that he was standing on the corner of Biscayne Boulevard and 63rd Street selling crack when he heard a shot fired further down the street. Although he saw two people in a car that was approached by several men, he testified that he was not paying close attention because he was in the process of a drug transaction. Upon hearing gunfire, he ran north on Biscayne Boulevard and saw the car in question pass him as he ran. At the hearing, he acknowledged that he did not see the shooter, nor could he describe the color of the car. He further acknowledged that he was under the influence of drugs the night of the murder, and that although his memory has been affected by drug use, Riechmann's private investigator visited with him before he testified at the hearing. He also admitted to thirty-eight felony convictions.
*360 The second eyewitness, Hilton Williams, a prison inmate, testified that at the time of the incident, he was selling drugs and was accompanied by his girlfriend and other friends including Stitt.[19] He testified that he saw a red rental car with a man and a woman inside. Believing that they were looking to buy drugs, someone in his group hollered to them, prompting the car to make a "u-turn" and return in their direction. He and his friends approached the driver's side of the car and noticed a lot of jewelry on the woman passenger. He testified that someone by the name of Mark, whom he thought was behind him on the driver's side, fired a shot. The car then sped away. He admitted to being convicted of ten felonies and admitted that he would lie if doing so suited his purposes. At first, he denied receiving compensation from Riechmann's investigator, but on cross-examination, he acknowledged that he was paid for his hotel room throughout the investigation. Both of these witnesses testified that they did not want to be involved in the investigation of the case when it happened.
The trial court comprehensively analyzed this claim and found:
The exculpatory testimony of Hilton Williams and Early Stitt was discovered after trial, would have been admissible at the trial, and is material to Defendant's guilt or innocence....
The Court further concludes that these witnesses were not previously known to the Defendant or trial counsel and were not discoverable in the exercise of due diligence. Trial counsel was not able to determine the location of the shooting with any precision. As a result, he could not reasonably investigate potential witnesses. Even if these witnesses could have been found, they would have been reluctant to testify at the time for fear of prosecution by the State for drug or other offenses, or from possible retribution.
Order at 39 (citations omitted). Notwithstanding, in applying the materiality prong of the Jones test, the court found:
The Court finds the testimony of Mr. Stitt and Mr. Williams to be less than credible and "rife with inconsistencies" with the Defendant's own testimony at trial. Mr. Stitt suffers from a drug problem that affects his memory. Mr. Williams has multiple convictions, is currently incarcerated for robbery, and initially had lied to the court during his testimony. He worked for the Defendant's investigator and received compensation, which he first denied, but then admitted. Finally, his testimony is inconsistent with the Defendant's own recollection of the events as well as the undisputed evidence that the victim was shot through the passenger window, not the driver's window. Furthermore, the Defendant mentioned only one person, the shooter, on the street at the time described, not several as described by Mr. Williams.
... [T]he Court concludes that the testimony of Mr. Stitt and Mr. Williams, without more, would probably not have created a reasonable doubt in the minds of the jury. The Court reaches this conclusion after evaluating the weight of both the newly discovered evidence and the totality of the evidence at trial.
Order at 40-41. As discussed above, the trial court's findings are supported by competent and substantial evidence presented at the hearing. Moreover, the trial court's conclusions on the effect of the outcome of the trial are supported by our decisions in Melendez v. State, 718 So.2d 746, 748 (Fla.1998) (holding that testimony of convicted felons did not support claim of newly discovered evidence because the trial court did not find them to be credible witnesses); Jones v. State, 709 So.2d 512 (Fla.1998) (affirming trial court's decision that there was no reasonable probability, given the lack of the witnesses' credibility, that a retrial would have resulted in defendant's *361 acquittal); and Blanco v. State, 702 So.2d 1250, 1252 (Fla.1997) (finding that testimony of newly discovered witnesses did not warrant a new trial where trial judge found that witnesses' lack of credibility would preclude any probability that a retrial would result in defendant's acquittal).

2. Evidence that Smykowski's Testimony was False
In support of Riechmann's second category of newly discovered evidence alleging that Smykowski's testimony was false, Michael Kloof testified at the evidentiary hearing that Smykowski told him that the prosecutors in the case asked Smykowski to testify that Riechmann had told him that he had killed Kischnick. He also testified that the prosecutors had told him that they would help him get out of his federal sentence. Riechmann alleges that this evidence could have been used at trial to impeach Smykowski, who testified at trial that he was getting no benefits from the State for testifying because the prosecutors had no authority over his federal sentence. However, at trial, Smykowski acknowledged that he was hoping that the State would write a letter to the judge who was sentencing him, and defense counsel asserted at closing argument that his testimony was motivated by his desire for such a letter. Moreover, although a letter was eventually written, the prosecutor testified at the evidentiary hearing that he had not promised to write one.
In its order the court made the following findings:
Regarding the Smykowski matter, there is express testimony at trial regarding the possibility of the prosecutor writing a letter to the federal parole authorities on his behalf[,] as well as defense counsel's argument to the jury about it. At the post conviction hearing, both prosecutors testified that there was no deal with Mr. Smykowski. Given that the newly discovered evidence with respect to Mr. Smykowski is only of an impeaching nature, and not evidence of any false statement, it presents no basis for relief.
Order at 42 (citations omitted). These findings are supported by the evidence presented at the hearing and at trial.

BRADY
Riechmann alleges numerous categories of Brady materials withheld by the State: (1) exculpatory police reports; (2) exculpatory German investigative materials and documents; (3) an undisclosed deal between prosecutors and Smykowski; (4) exculpatory photographs of the automobile; (5) notes and reports of forensic experts; and (6) telexes and communications with German authorities.[20]
*362 Recently, the United States Supreme Court announced three components that a defendant must show to assert a Brady violation successfully:
The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.
Strickler v. Greene, 527 U.S. 263, 119 S.Ct. 1936, 1948, 144 L.Ed.2d 286 (1999). This prejudice is measured by determining "whether `the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" Id. at 1952 (quoting Kyles v. Whitley, 514 U.S. 419, 435, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995)). In applying these elements, the evidence must be considered in the context of the entire record. See Haliburton v. Singletary, 691 So.2d 466, 470 (Fla.1997) (quoting Cruse v. State, 588 So.2d 983, 987 (Fla.1991)).

1. Police Reports
Riechmann alleges that the State withheld or deleted portions of police reports concerning the height of the passenger side car window, the portion of the reports dealing with an interview with the waiter who attended them on the night of the murder, and a statement made by Kischnick's father. The amount of the opening of the window is relevant because at trial, the theory of the State's expert, Rhodes, was that the narrower the opening of the window, the more significant the gunshot residue found on Riechmann's hands became. The greater the opening, the more likely that gunshot residue could be found on Riechmann's hands without him having fired the gun. At trial, it was established that the window was only open 3½ inches. However, three police reports provided different measurements of the opening of the window. In one of the police reports, authored by Detective Hanlon, Rhodes had stated that the passenger window was no more than 6 inches from being fully closed. In the other two reports, serologists reiterated this six-inch measurement based on blood spattered on the passenger door window. In yet another police report, prepared by Detective Trujillo, a statement provided by the crime lab that the window was completely down had been whited-out.
The State concedes that it possessed the reports and that it did not turn them over to Riechmann. The trial court found that the only significant information withheld by these police reports was the crime lab's representation in Trujillo's report which stated that the window had to have been all the way down. However, the court found that there was no reasonable probability that the results of the trial would have been affected had this evidence been disclosed.
These findings are supported by the evidence presented at the hearing. Any evidence that the window was open no more than 6 inches is not much different from that presented at trial that the window was open 3½ inches. Moreover, the statement by the crime lab that the window was completely down would not be completely favorable to Riechmann, because he testified at trial that the window was only open half-way. Additionally, it would have also been inconsistent with the testimony of his expert, who stated that the window was only 3 ¾ inches open. Therefore, Riechmann *363 has not satisfied the materiality prong of the test.
As far as the waiter's statements made to the police that Riechmann and Kischnick were in a festive mood the night of the murder, this evidence does not establish a Brady claim because it serves as cumulative evidence. Lastly, with regard to Kischnick's father's statement to the police that Kischnick and Riechmann had a loving relationship, Riechmann failed to show how he could have used this report (or the statement therein) at trial, since the father never testified and Riechmann introduced no evidence that the father would have done so if asked.

2. Exculpatory German Investigative Materials and Documents
Riechmann claims that the State suppressed statements from witnesses establishing that Riechmann and Kischnick had a loving relationship. The German police took 37 statements from people in Germany who knew Riechmann and Kischnick. However, the evidence shows that before trial, defense counsel learned of these statements during discovery and requested copies of the statements that he did not already possess. When the State did not comply, Riechmann moved the court to conduct an in camera inspection and then to turn them over to Riechmann. The court never ruled on this motion, and defense counsel never renewed his motion until the trial judge later stated that he relied on the statements to find that Riechmann was a good person. In his order, the trial court found that these statements would have been material to Riechmann in the sentencing phase because they would have allowed counsel the opportunity to present some mitigating evidence. We agree, and for the new penalty phase, these statements will be made available to Riechmann.
However, Riechmann's claim on this issue, as it relates to the guilt phase, is procedurally barred because he could and should have raised it on direct appeal, since by trial's end he was aware of the statements. See Francis v. Barton, 581 So.2d 583 (Fla.1991). Notwithstanding, the trial court found that even if disclosed, there was no reasonable probability that a different result would have occurred. We agree.

3. Undisclosed Deal with Informant Smykowski
Here, Riechmann claims that the State withheld evidence of a deal offered by the State to Smykowski in return for his testimony. This claim is predicated on a letter written by the prosecutor on Smykowski's behalf to the U.S. Parole Commission, acknowledging his assistance in Riechmann's trial, and on handwritten notes discovered in the state attorney's file stating that the prosecutor was supposed to contact a federal magistrate so that Smykowski might be rewarded. The letter, which was written after the verdict and the jury's recommendation of death, but before sentencing, was not disclosed to Riechmann. At trial, Smykowski denied that he had entered into a deal with the State or that he had been promised anything by the State in return for his testimony. However, he did testify that he was hoping the State would write such a letter on his behalf. At the evidentiary hearing, the prosecutor testified that he did not promise Smykowski anything in return for his testimony. As to the handwritten letters, the prosecutor testified that the notation was simply a request by Smykowski's intermediary that he be permitted to remain, and that the last word on the note was "remain," not "reward." The trial court found that there was no undisclosed deal between Smykowski and the State. These findings are supported by competent, substantial evidence from the record.
Accordingly, we affirm the trial court's denial of Riechmann's Brady claim in its entirety.

*364 II. HABEAS CORPUS
In his petition for writ of habeas corpus, Riechmann raises five claims.[21] All of these issues are either not cognizable in a habeas petition[22] or are simply without merit.[23] Notwithstanding, we will address Riechmann's claim of ineffective assistance of appellate counsel.

INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL
This Court has stated that the criteria for proving ineffective assistance of appellate counsel parallel the standard used for ineffectiveness of trial counsel claims. See Williamson v. Dugger, 651 So.2d 84, 86 (Fla.1994). Specifically, defendants must show
1) specific errors or omissions which show that appellate counsel's performance deviated from the norm or fell outside the range of professionally acceptable performance and 2) the deficiency of that performance compromised the appellate process to such a degree as to undermine confidence in the fairness and correctness of the appellate result.
Wilson v. Wainwright, 474 So.2d 1162, 1163 (Fla.1985) (citing Johnson v. Wainwright, 463 So.2d 207 (Fla.1985)).
Under this heading, Riechmann raises eleven points of error.[24] All *365 of these points are without merit. Point (1) has been rendered moot as a result of our approval of the trial court's ruling ordering a new sentencing proceeding. Points (3), (4), (9), and (11) are without merit because appellate counsel indeed raised these issues on direct appeal. Finally, points (2), (5), (6), (7), (8) and (10) either fail on their merits, are barred because counsel raised the issue on appeal but simply argued different grounds, or involve an issue that was simply not preserved for appeal. However, we will address this final category below.
As point (2), Riechmann alleges that appellate counsel was ineffective for failing to argue that the State had improperly presented evidence that Riechmann had a motive to kill. This Court has held that evidence may be admitted in a criminal case if it is relevant as to the motive for the crime involved. See, e.g., Sims v. State, 681 So.2d 1112, 1115 (Fla.1996). Therefore, we conclude that appellate counsel cannot be deemed ineffective for failing to raise this issue.
As point (5), Riechmann asserts that appellate counsel was ineffective for failing to assert that the record on appeal was missing seven pages. This claim is without merit. Although the record presented by appellate counsel was missing seven pages, the State's copy of the record included these missing pages.
As point (6), Riechmann asserts that appellate counsel was ineffective for failing to raise the issue regarding the manner in which the trial court responded to the jury's request for the transcript of the testimony of prostitute Dina Mohler and Kischnick's sister, Regina Kischnick.
This claim is without merit. Trial judges have broad discretion in deciding whether to read back testimony. See Henry v. State, 649 So.2d 1361, 1365 (Fla. 1994); Coleman v. State, 610 So.2d 1283, 1286 (Fla.1992). In the instant case, the judge met with both parties in chambers before responding to the jury's request. Additionally, although the testimony in the case lasted four weeks, Riechmann has failed to assert how the trial court's decision and appellate counsel's failure to challenge that decision would have changed the outcome on appeal, especially since both of the witnesses testified on behalf of the State and a repetition of their testimony would have further prejudiced the defense. See Gonzalez v. State, 624 So.2d 300 (Fla.App.1993).
As point (7), Riechmann alleges that appellate counsel was ineffective for failing to raise an alleged violation of his speedy trial rights. In order to claim a violation of speedy trial rights, a defendant must move for a discharge. Riechmann failed to do this before the start of trial; therefore, he was precluded from raising the issue on direct appeal. Furthermore, Riechmann waived his right to a speedy trial by taking a continuance. See Rutledge v. State, 374 So.2d 975, 979 (Fla. 1979). Therefore, appellate counsel cannot be deemed ineffective for failing to raise this issue.
As point (8), Riechmann alleges that appellate counsel was ineffective for failing to raise the alleged failure of the police to inform Riechmann of his right to have contact with the German Consulate under the Vienna Convention on Consular Relations. However, appellate counsel cannot be deemed ineffective for failing to raise this issue because it was not raised or preserved at trial. See Williamson v. Dugger, 651 So.2d 84, 86 (Fla.1994).
Finally, point (10) was raised on appeal, but on different grounds. In this issue, Riechmann alleges that appellate counsel was ineffective for the manner in *366 which he raised the issue of the legality of the German searches. This claim is without merit because different grounds or legal arguments cannot be used to render appellate counsel ineffective. See San Martin v. State, 705 So.2d 1337, 1345 (Fla. 1997); Steinhorst v. State, 412 So.2d 332, 338 (Fla.1982). As part of this claim, Riechmann also argues that the prosecutors should have known that a German court had held the search on January 14, 1988, to be unlawful and had ordered the fruits of the search suppressed. However, at the evidentiary hearing, the prosecutor testified that she was not aware of the German court's order and it had no bearing on the State's decision not to introduce any evidence seized from this search. Additionally, the record reflects that no evidence was introduced concerning this search; therefore, appellate counsel could not be deemed ineffective for failing to raise this issue.

CONCLUSION
In sum, we affirm the trial court's order in its entirety and remand with directions that a new sentencing proceeding be promptly conducted by a different trial judge and before a newly empaneled jury.
It is so ordered.
HARDING, C.J., and SHAW, ANSTEAD, PARIENTE, LEWIS and QUINCE, JJ., concur.
WELLS, J., concurs as to conviction, and concurs in result only as to sentence.
NOTES
[1] The two aggravating factors found by the trial court were: (1) murder committed for pecuniary gain; (2) murder committed in a cold, calculated, and premeditated manner.
[2] Although we found that the trial court abused its discretion in admitting Riechmann's involuntary manslaughter and negligent bodily harm conviction connected with an automobile accident, we concluded that this error was harmless. See Riechmann v. State, 581 So.2d 133, 140 (Fla.1991).
[3] Riechmann v. Florida, 506 U.S. 952, 113 S.Ct. 405, 121 L.Ed.2d 331 (1992).
[4] This motion contained fourteen claims, eleven of which asserted ineffective assistance of counsel. The remaining claims consisted of newly discovered evidence, a Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) violation, and a final claim that the sentence was invalid because the trial judge's findings were written by the prosecutor instead of the judge and were provided to the judge ex parte.
[5] Riechmann does not challenge the summary denial of this claim.
[6] These claims include: (1) ineffective assistance of counsel at the guilt phase; (2) newly discovered evidence; (3) Brady claims; (4) ineffective assistance of counsel for failing to investigate legality of German searches; (5) ineffective assistance of counsel for failing to present evidence of acquittal on federal gun charges; (6) ineffective assistance of counsel for not objecting to improper comments in closing argument; (7) ineffective assistance of counsel during voir dire; and (8) ineffective assistance of counsel for failing to cross-examine key state witnesses.
[7] Specifically, the petition for writ of habeas corpus raises five claims: (1) ineffective assistance of appellate counsel; (2) the propriety of the trial court's rulings; (3) Brady violation and perjured testimony; (4) violation of Riechmann's equal protection by this Court and (5) ineffective assistance of postconviction counsel.
[8] Judge Alan S. Gold was designated by this Court to preside over the postconviction proceedings in this case after the original trial judge was called as a witness in the case with regard to the ex parte communication and delegation of authority to the prosecutor to prepare the sentencing order. We commend Judge Gold for the thoroughness of the order rendered in this case. Although this case presents challenging and complex issues, Judge Gold's order provides a thorough and detailed analysis of the issues and serves as a model order for other trial judges.
[9] These seven witnesses consisted of four business acquaintances (his two landladies, his hairdresser and the hairdresser's wife), two ex-girlfriends and a long-time friend.
[10] In the record, this witness' name was spelled as Potolski. However, it has been brought to our attention that the correct spelling is with a "y." Therefore, we have issued a corrected opinion to reflect the correct spelling.
[11] Riechmann did not become aware of the State's role until he received the State's files pursuant to a public records request under chapter 119, Florida Statutes, and there discovered a rough draft of the sentencing order.
[12] This is still required today. See § 921.141(3), Fla. Stat. (1999).
[13] The State argues that Spencer does not apply to this case because in Armstrong v. State, 642 So.2d 730, 738 (Fla.1994), we held that our decision in Spencer, as far as it pertained to the procedure to be followed by the trial judges (i.e., giving defendants an opportunity to be heard before formulating the sentencing decision), was a change in procedure and should not be applied retroactively. However, it is clear that our bar on retroactive application as discussed in Armstrong does not apply to the portion of the opinion dealing with ex parte communication.
[14] Claims (1), (2), (3), (4), (5), (7) and (8) are without merit. Alternatively, claims (4), (5) and (6) are procedurally barred in that Riechmann is raising the same claims raised on direct appeal and in his motion for rehearing, but is couching them in terms of ineffective assistance of counsel. See Medina v. State, 573 So.2d 293, 295 (Fla.1990) (stating that claims of ineffective assistance of counsel should not be used to circumvent the rule that postconviction proceedings cannot serve as a second appeal.)

In claim (4) (ineffective assistance of counsel for failing to investigate the legality of the German searches), Riechmann alleges that if defense counsel had investigated the German searches and seizures, he could have obtained suppression of the items introduced as a result. This claim fails the prejudice prong of the test because the evidence introduced from these searches, consisting primarily of Riechmann's address books which led to contacting people who knew him and Kischnick, does not undermine confidence in the outcome of the trial.
As claim (5) (ineffective assistance of counsel for failing to present evidence of acquittal of federal gun charges), Riechmann alleges that due to counsel's failure to inform the jury that he was acquitted of the federal gun charges, the jury had no way of knowing that the statements made to informant Walter Smykowski were made at a time when Riechmann had not been charged with the murder of Kischnick. Even if defense counsel had instructed the jury that Riechmann was acquitted of these charges, there is no reasonable probability that the outcome would have been different because the evidence shows that Riechmann knew of the likelihood of being arrested for the murder soon after the murder. Further, this evidence could have been used to show that although he had not been arrested for the murder at the time he assigned the insurance policies, he was aware that his arrest was imminent.
As claim (6) (ineffective assistance of counsel for failing to object to improper comments during closing argument), Riechmann alleges that defense counsel's failure to object to the State's improper comments during closing argument affected the outcome of the trial. On direct appeal, we wrote: "[T]he alleged acts of misconduct, individually or collectively, did not deny Riechmann his right to a fair trial." Riechmann v. State, 581 So.2d 133, 139 (Fla. 1991). In this same manner, after a second review of the comments made by the prosecutor, we agree with the trial court's findings that the failure to object to these comments does not undermine confidence in the outcome of the trial.
As claim (7) (ineffective assistance of counsel during voir dire), Riechmann alleges that defense counsel was ineffective and prejudiced Reichmann in denying him the right to pick his jurors and in failing to allow an appropriate African-American representation. We agree with the trial court's finding that Riechmann failed to satisfy his burden of proving either deficiency or prejudice. At the evidentiary hearing, Riechmann only presented the testimony of the interpreter, Brophy, who stated that Riechmann and defense counsel had argued over the seating of a juror, and the testimony of defense counsel, who testified at the hearing that he made the final decision, after consulting with Riechmann, of who to seat as jurors. However, Brophy was unable to name any specific jurors over whom they had a disagreement. Moreover, as to his claim that he did not have enough minority representation on the jury, the rule is that although petit juries must be drawn from a source fairly representative of the community, there is no requirement that the juries chosen must mirror the community and reflect the various distinctive groups in the population. See Taylor v. Louisiana, 419 U.S. 522, 538, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975). Notwithstanding, the record reflects that several African-Americans were seated as jurors in the case.
As claim (8), (ineffective assistance of counsel for failing to cross-examine key State witnesses), Riechmann alleges that counsel's failure to challenge the State's witnesses undermines confidence in his trial. We do not agree. As we discuss in our analysis of issue (1), counsel extensively cross-examined Smykowski and the State's blood and gunshot experts. Therefore, this claim fails as to those witnesses. As to the remaining witnesses allegedly not cross-examined, Riechmann has failed to allege what evidence, if any, counsel could have discovered or used to cross-examine these witnesses.
Although we also find claims (1) (ineffective assistance of counsel during the guilt phase); (2) (newly discovered evidence claim); and (3) (Brady claim) to be without merit, we will address them in greater detail below.
[15] These areas include: (1) counsel's failure to investigate facts of Riechmann's innocence; (2) counsel's failure to investigate times and distances concerning the night of the crime and the crime scene itself; (3) counsel's failure to present evidence of Riechmann's relationship with Kischnick; (4) counsel's failure to investigate information that would have discredited the state's jailhouse informant; (5) counsel's failure to introduce the secretly recorded four hour tape of the interview with police; (6) counsel's failure to explore cultural differences between Germany and the United States; and (7) counsel's failure to rebut the state's theory of Kischnick's physical condition. These claims were grouped together by the trial court.
[16] As part of his Brady claim, counsel claimed that this list was withheld from him.
[17] This juror was subsequently removed from the jury.
[18] In support of this third category, Riechmann presented the testimony of Dr. Karen McElrath at the evidentiary hearing who testified that there was a recognizable pattern of similar murders involving tourists occurring in South Florida. However, she acknowledged that the only research she had conducted in determining this pattern was from newspaper articles in the Miami Herald, the local newspaper. She further testified that she had not read all of these articles and, more importantly, she had not considered official records regarding tourist crimes. Based on her testimony, we find that the trial court correctly concluded that her testimony did not qualify as newly discovered evidence, and if it did it would probably not have produced an acquittal on retrial.
[19] Stitt, however, testified that he did not see Williams on the night of the murder.
[20] As to category (4) (missing photographs from the scene), Riechmann alleges that the State suppressed photographs taken by police of the interior of the car. He claims that few crime scene photos have been produced in comparison to the amount of photos that were taken. He further alleges that when he examined the negatives at trial, numbered photos in the middle and beginning of rolls were missing. To the extent that this claim pertains to the trial record, it is procedurally barred because Riechmann could and should have raised the issue on direct appeal. See Francis v. Barton, 581 So.2d 583 (Fla.1991). Notwithstanding, the claim also fails on its merits because Riechmann has presented no evidence of any photographs withheld. More importantly, he has failed to show how these allegedly withheld photographs, if disclosed, would create a reasonable probability that the outcome of the trial would have been different.

As to category (5) (withheld notes and reports of forensic experts), Riechmann claims that the State withheld forensic notes and reports of ballistics and serology evidence. However, as pointed out by the State in its brief, this issue was litigated before trial; therefore, Riechmann is procedurally barred from raising it here. See Francis v. Barton, 581 So.2d 583 (Fla.1991). On its merits, the claim also fails. The record reflects that Riechmann obtained the notes from Rao, the State's gunshot residue expert. Moreover, as to Rhodes' records, the trial court ruled that they were not subject to discovery. Further, the trial court reviewed the notes and found that Riechmann had already been provided with the information contained therein.
With regard to category (6) (suppression of telexes between the Miami Beach Police Department and the German police), Riechmann claims this evidence could have been used to show that the German searches were invalid. This claim is without merit because at the time of trial, Riechmann had at least some of the telexes, as is evidenced by his introduction of them at the suppression hearing. As far as Riechmann's claim that the State misled the court regarding the legality of the German searches, Ms. Sreenan, one of the prosecutors in the case, testified that she was unaware that a German court had invalidated one of the German searches until after the 3.850 motion was filed.
We will address categories (1), (2), and (3) in greater detail in the text below.
[21] These claims include: (1) ineffective assistance of appellate counsel; (2) the trial court's abuse of discretion regarding the propriety of its rulings at trial; (3) the state's suppression of favorable evidence under Brady; (4) this Court's denial of Riechmann's equal protection rights by failure to review the entire record and by denying his request to file an oversize brief; and (5) ineffective assistance of postconviction counsel.
[22] Claim (2) is not cognizable in a habeas corpus petition because it was raised or should have been raised on direct appeal. See Hardwick v. Dugger, 648 So.2d 100, 105 (Fla.1994).

Claim (3) also cannot be raised in a petition for habeas corpus because it was properly raised in a 3.850 motion. See Kokal v. Dugger, 718 So.2d 138 (Fla.1998); see also Blanco v. Wainwright, 507 So.2d 1377, 1384 (Fla. 1987) ("By raising the issue in the petition for writ of habeas corpus, in addition to the rule 3.850 petition, collateral counsel has accomplished nothing except to unnecessarily burden this Court with redundant material.").
Claim (5) is likewise not cognizable in a petition for habeas corpus. Ineffective assistance of counsel claims must be raised in the court in which the alleged ineffectiveness occurred. See Shere v. State, 742 So.2d 215 (Fla.1999) (citing Knight v. State, 394 So.2d 997 (Fla.1981); Richardson v. State, 624 So.2d 804 (Fla. 1st DCA 1993); Turner v. State, 570 So.2d 1114 (Fla. 5th DCA 1990)). Moreover, we have not recognized ineffective assistance of postconviction counsel claims. See Lambrix v. State, 698 So.2d 247, 248 (Fla.1996) (citing Murray v. Giarratano, 492 U.S. 1, 109 S.Ct. 2765, 106 L.Ed.2d 1 (1989), and Pennsylvania v. Finley, 481 U.S. 551, 107 S.Ct. 1990, 95 L.Ed.2d 539 (1987)), cert. denied, 522 U.S. 1122, 118 S.Ct. 1064, 140 L.Ed.2d 125 (1998).
[23] Claim (4) is clearly without merit. The decision of this Court reflects that the Court reviewed the sufficiency of the evidence presented and the propriety of the penalty imposed. See Riechmann, 581 So.2d at 141 ("There is substantial competent evidence in the record to support the convictions."). Additionally, Riechmann has not alleged what portion of the record was not considered by the Court. Although the Court denied Riechmann's request to file oversized briefs, the Court did allow him to file a supplemental brief wherein Riechmann raised nine new issues.

Finally, as part of this claim, Riechmann alleges that appellate counsel failed to communicate and consult with him on legal issues. However, in response, Riechmann filed a letter in which he complained of the issues not raised in his initial brief. After this letter, appellate counsel filed a supplemental brief which raised all the issues complained of by Riechmann, and Riechmann filed no more complaints. Therefore, Riechmann has not alleged any prejudice resulting from appellate counsel's conduct.
[24] These points of error include: (1) failure to raise penalty phase issues; (2) failure to raise improper admission of motive evidence; (3) failure to raise introduction of "dirty" magazine; (4) failure to raise improper comments made by the prosecutor; (5) failing to raise issue that record on appeal was incomplete; (6) failure to raise trial judge's improper response to jury; (7) failure to raise speedy trial issue; (8) failure to raise issue of Riechmann's rights under the Vienna Convention; (9) failure to raise issue concerning the admission of prior convictions through wrong records custodian; (10) failing to raise additional arguments concerning the legality of German searches; and (11) failure to raise issue of statements made after acquittal on federal gun charges.